## ST. LOUIS AND THE KANSAS CITY

# COURTS OF APPEALS

AT THE

OCTOBER TERM, 1906.

*(Continued from Volume 120.)*

McFERN, Respondent, v. GARDNER, Appellant.

**St. Louis Court of Appeals, November 27, 1906.**

1. **NEGLIGENCE: Automobiles: Prima Facie Case.** In an action for damages on account of the death of plaintiff's husband caused by a collision of his buggy with the defendant's automobile, where the evidence tended to show that the automobile was traveling at a dangerous rate of speed on a dark night without lights and without sounding the horn and that the chauffeur turned to the left instead of to the right, contrary to section 9458, Revised Statutes 1899, the plaintiff made out a prima facie case of negligence on the part of the defendant.

2. ———: ———: **Vigilant Watch.** While automobiles have equal rights upon the public roads with horses and carriages, they are nevertheless so strong, swift and dangerous in a collision, that the chauffeur in charge is bound to exercise care commensurate with the risk of injury to other vehicles and pedestrians on the road and this risk is greater than from ordinary vehicles; it is the duty of the chauffeur in charge of an automobile to keep a vigilant watch ahead for vehicles and pedestrians and, on the first appearance of danger, to take proper steps to avert an accident, the same rule which applies to a motorman in charge of a street car.

( 1 )

McFern v. Gardner.

3. ———: ———: Contributory Negligence. In an action brought by plaintiff for damages to her on account of the death of her husband, caused by a collision with the defendant's automobile, where the evidence was conflicting as to whether the deceased was intoxicated and whether he was guilty of violating the city ordinance by fast driving, the question of whether he was guilty of contributory negligence which would preclude recovery was properly submitted to the jury.

4. ———: ———: ———: Emergency. In such case although the deceased turned to the left instead of to the right, he was not therefore guilty of negligence as a matter of law because he was confronted with a sudden danger in the near approach of the automobile and could not in the emergency be required to exercise the best judgment.

5. PRACTICE: Evidence: Failing to State Answer Expected. Although the trial court may err in refusing to permit a witness to answer a proper question, the appellate court cannot reverse the case on account of such error unless it is shown what answer the witness was expected to give so that the appellate court may determine whether the ruling was prejudicial.

6. ———: Examining Jury: Refusing Counsel Opportunity to Question Jurors. Where the appellant complains that his counsel was not given sufficient opportunity to examine the jury in the trial court on their *voir dire*, on account of being engaged in the trial of another case, the evidence is examined and held that the proceedings in that regard were not prejudicial to the appellant.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor*, Judge.

AFFIRMED.

*John A. Talty* for appellant.

(1) The court erred in refusing the instruction in the nature of a demurrer to the evidence offered by defendant at the close of plaintiff's evidence in chief, and also at the close of all the evidence. (a) There was no evidence of any negligence on the part of the defendant. Hyde v. Railroad, 110 Mo. 280; Knapp v. Hanley, 108 Mo. App. 360. (b) Said instruction should have been given because the evidence shows clearly and conclusively that the deceased was guilty of negligence that direct-

ly contributed to the accident. Chaney v. Railroad, 176 Mo. 606; Buesching v. Gas Light Co., 73 Mo. 229; Hudson v. Railroad, 101 Mo. 34. And it would be no answer to this to say that Kelly's testimony shows that the defendant was guilty of negligence. Shearman and Redfield, Negligence, secs. 25, 26, 96; Barrie v. Transit Co., 102 Mo. App. 92. The use of streets must be, and have been, extended to meet the modern means of locomotion. Automobiles have an equal right with other vehicles in common use, to occupy and use the public streets and highways. Upton v. Windham, 75 Conn. 293; Chicago v. Banker, 112 Ill. App. 99. (2) The court erred in excluding the testimony of Michael Mullen, offered by the defendant. The defendant by this witness desired and offered to show what business the deceased was engaged in and what manner of man he was by the statements and declarations of the deceased himself to the witness. Proctor v. Railway, 64 Mo. 120; White v. Maxey, 64 Mo. 558. "It transmits to designated persons a cause of action that the injured party would have had, had death not ensued." Gray v. MacDonald, 104 Mo. 311; Strode v. Transit Co., 95 S. W. 851. (3) The judgment should be reversed on grounds 1, 2, 3 and 4 of plaintiff's motion for a new trial. The court prejudged defendant's case and interests by, among other things, compelling him to go to trial in the absence of, and while, his sole attorney in the case was engaged in the actual trial of a case in another division of the court, by accusing his attorney in the presence and hearing of the jury of bad faith and of having made misstatements to the court, and by telling defendant to employ another lawyer. Williams v. West Bay City, 119 Mich. 395, 22 Am. St. Rep. 673; Reilly v. Railroad, 90 Ill. App. 364.

*Joseph A. Wright* for respondent.

(1) Upon testimony introduced, coupled with the physical facts, plaintiff's case was properly submitted

to the jury. Luckel v. Building Co., 177 Mo. 608; Campbell v. Railroad, 175 Mo. 161; Erickson v. Railroad, 171 Mo. 647; Payne v. Railroad, 136 Mo. 562; Spiro v. Transit Co., 102 Mo. App. 250. (2) The humanitarian or last chance doctrine is now firmly established in our jurisprudence. Rapp v. Transit Co., 190 Mo. 161; Scullin v. Railroad, 184 Mo. 707; Klockenbrink v. Railroad, 172 Mo. 688; Hilz v. Railroad, 101 Mo. 36, 54; Hyman v. Transit Co., 108 Mo. App. 460; Biscuit Co. v. Transit Co., 108 Mo. App. 303; Kolb v. Transit Co., 102 Mo. App. 143; Grocer Co. v. Railroad, 89 Mo. App. 402. (3) The operation of an automobile is attended with such unusual and increased perils to others upon the streets or highways, as to render the humanitarian doctrine very justly applicable in the following leading automobile negligence cases: Christy v. Elliott, 216 Ill. 45, 1 L. R. A. (N. S.) 215; Indiana Springs Co. v. Brown (Ind. Sup.), 74 N. E. 615, 1 L. R. A. (N. S.) 238; McCullough v. Shinkle, 116 Ky. 960; Hannigan v. Wright (Del.), 63 Atl. 234; Wright v. Crane (Mich.), 106 N. W. 71; Hennessey v. Taylor, 189 Mass. 583; Kathemeyer v. Kehler (N. J. L.), 60 Atl. 40; Ex Parte Berry (Cal.), 82 Pac. 44; Buscher v. Transportation Co. (N. Y.), 106 App. Div. 493; Murphy v. Wait (N. Y.), 102 App. Div. 121. (4) An alleged statement made to witness Michael Mullen, by deceased long prior to accident is inadmissible, for it had no possible bearing on the cause of death and therefore constituted no part of the *res gestae.* In any event, the bill of exceptions is silent regarding what defendant intended to prove, and the court's action in refusing testimony offered can only be reviewed on appeal when the bill of exceptions shows what the appellant expected to prove. Summers v. Ins. Co., 90 Mo. App. 691; McCormick v. St. Louis, 166 Mo. 315; State v. Martin, 124 Mo. 515; Hickman v. Green, 123 Mo. 165; State v. Nocton, 121 Mo. 537; Berthold v. O'Hara, 121 Mo. 89; Fitzgerald v. Barker, 96 Mo. 661; Kraxberger v. Roiter,

91 Mo. 404; Jackson v. Hardin, 83 Mo. 175; State ex rel. v. Leland, 82 Mo. 260; Bank v. Aull, 80 Mo. 199. (5) The mode and manner of impanelling the jury was just and proper. Defendant cannot remain silent until after verdict; if he wished to avail himself of these alleged errors, he should have challenged in writing the array of jurors, before jury had been sworn, and saved his exceptions, in the event challenge had been overruled. State v. Brennan, 164 Mo. 487; State v. Taylor, 134 Mo. 109; State v. Clark, 121 Mo. 500; Tarkio v. Cook, 120 Mo. 11; State v. Sansome, 116 Mo. 1; State v. Smith, 114 Mo. 406; State v. Brewer, 109 Mo. 648.

BLAND, P. J.—On November 11, 1904, at 6:30 p. m., Alfred L. McFern, plaintiff's deceased husband, and Commodore Kelly were driving a light, low, one-horse buggy (a runabout) on Forest Park roadway. The buggy collided with defendant's automobile a little north of the intersection of the roadway with Forest Park boulevard. The buggy was traveling north and the automobile south. The shock of the collision threw both McFern and Kelly into the street, causing injuries to McFern from which he died a few hours thereafter. The petition alleges the collision, resulting in the death of plaintiff's husband, was caused by the negligence of defendant. The answer was a general denial and an affirmative plea of contributory negligence. Verdict and judgment for plaintiff for three thousand dollars. Defendant appealed.

Defendant moved the court to peremptorily instruct the jury that plaintiff could not recover, and assigns as error the refusal of the court to so instruct.

1. Every litigant has a right under the Constitution, when he has offered substantial evidence tending to prove his case to have it submitted to the jury; and for the purpose of determining whether or no there is sub-

stantial evidence to submit to the jury, the testimony of
plaintiff as offered should be accepted as true and every
reasonable inference in his favor should be drawn there-
from.   [Ladd v. Williams, 104 Mo. App. 390, 79 S. W.
511, and cases cited.]   It was not enough to show an ac-
cident and injury.   A causal connection must be estab-
lished between the accident and the negligence charged
in order to make out a case for the jury.   [Warner v.
Railway, 178 Mo. 125, 77 S. W. 67; Conner v. Railroad,
181 Mo. 397, 81 S. W. 145.]   A correct application of
these well-settled principles of law to the facts in the
case in hand requires a somewhat detailed statement of
plaintiff's evidence and of some of the physical facts
bearing upon this evidence.

Kelly testified McFern was seated on his left but had
the lines in his hands and was doing the driving, when
the accident happened; that they were traveling north
on the east side of Forest Park roadway at a speed of
about eight miles an hour; that when they were near,
but a little north of the intersection of Forest Park road-
way with Forest Park boulevard, he saw an automobile,
fifty or sixty feet away, coming south on the east side
of the road, at a speed of from twenty to twenty-five miles
an hour; that there were no lights on the buggy or auto-
mobile, and the night was foggy and "awful dark."   We
quote the following from Kelly's testimony:

"Q.   Were you in a position that you could see?   A.
Yes, I thought I did before McFern did, at least I thought
so; I think pretty near the automobile when I saw it as
I did for the reason I was sitting as now—turned around
of course.   The horse's head being reined up, sitting in
the low runabout I was afraid he didn't see it as quick
as I did; I made a jump for the lines, with that he threw
the horse to the right, I never touched the lines, I think
when I grabbed for the lines made Mac realize he already
threw the horse to the right.

"Q.   Which way did he pull the horse?   A. Pulled

to the left. I jumped to the left when he threw the horse to the right, threw it in front of the automobile. . . .

"Q. Now, Mr. Kelly, was that automobile running fast or slow when you saw it? A. It was running fast.

"Q. Have you had occasion to observe the speed of horses, automobiles and moving objects? A. Well, of course I have timed horses. I never timed engines or anything of that kind but I don't think it could have been running less than twenty miles an hour because it was so quick onto us after I saw it.

"Q. What time elapsed from the time you saw the automobile until the crash? A. Well, I just jumped, made an effort to jump at the lines; whether I sat down or got knocked down, I was down so quick I couldn't tell you. . . .

"Q. Did the chauffeur turn the automobile in any direction after it came in sight? A. Turned it right into us; McFern threw the horse to the left; the automobile, after he threw the horse right threw it right in front, threw the horse this way (indicating) over to the left.

"Q. Which way did the chauffeur turn the automobile? A. The automobile turned right into us.

"Q. To the right? A. Certainly.

"Q. Was the automobile east or west of you the first time you saw it? A. East.

"Q. How fast were you driving the horse at the time of that accident? A. Well we were driving I suppose a gait of about eight miles an hour, driving along a nice little gait.

"Q. A road gait? A. Yes, sir.

"Q. Were you unconscious when the automobile hit the buggy? A. The first thing I knew they were dressing my head where I was cut on the side."

The horse escaped injury. The right fore wheel of the buggy was crushed by coming in contact with the automobile. One of the lamps on the front of the auto-

mobile and the glass protector were crushed, the broken pieces of glass falling in the road fifteen or twenty feet west of the east gutter. The buggy was pushed over near the center of the road by the force of the collision. The road was fifty or sixty feet wide. The automobile weighed eighteen hundred pounds and was propelled by steam. The horn was not sounded. The evidence tends to show that an automobile traveling twenty-five miles per hour could be stopped with safety to the occupants in thirty feet, one traveling at a speed of twenty miles per hour in twenty-five feet, and one traveling four to six miles per hour in ten feet. Defendant and his wife were in the automobile at the time the accident, and defendant testified the power was shut off and they were traveling very slowly, getting ready to turn into Forest Park boulevard to go to his home about three hundred yards distant. John C. Horner, the chauffeur, who was driving the machine, testified he was going very slow, three or four miles an hour; that he neither saw nor heard the buggy until it struck the right side of the machine. Defendant also testified the buggy struck the right side of the automobile, and that the buggy collided or ran into the machine.

Section 9458, R. S. 1899, provides: "When any persons traveling with any carriage, wagon or other vehicle shall meet on any turnpike, road or public highway in this State, the persons so meeting shall seasonably turn their carriage, wagon or other vehicle to the right of the center of the road, so as to permit each carriage, wagon or other vehicle to pass without interfering or interrupting, under the penalty," etc. Kelly testified the collision took place north of the intersection of Forest Park boulevard with Forest Park roadway. Defendant's testimony is to the effect they were getting ready to turn the automobile into Forest Park boulevard, not that they were turning in. On this evidence it was defendant's duty to have turned to the right, and west of the center

of the road on meeting the buggy, if the buggy was or could have been seen by the exercise of ordinary care; and Kelly's testimony, that he saw the automobile when it was fifty or sixty feet from him and that it had no lights, is some evidence tending to show the buggy could have been seen that distance by the chauffeur, if he had been looking; and it was for the jury, under all the facts and circumstances in evidence, to find whether or not the buggy could have been seen by the chauffeur had he exercised ordinary care in keeping a lookout ahead for vehicles on the road. Kelly's testimony tends to show the automobile was driven at a dangerous and reckless speed, on a dark night, without lights and without sounding the horn. Plaintiff's evidence, therefore, tends to show the chauffeur was negligent in driving or turning the automobile to the left instead of the right, as required by the statute; that he was negligent in failing to look and see the buggy in time to have stopped the machine or turn it out of the path of the buggy to avert the collision, and was further negligent in driving the automobile at a dangerous and reckless speed in the circumstances related, and we think plaintiff made a case for the jury. But defendant contends the chauffeur was under no legal obligation to keep a watch ahead for other vehicles, and on the first appearance of danger to use ordinary care to avoid the collision.

In Shinkle v. McCullough, 116 Ky. 1. c. 965-6, the court said: "While automobiles are a lawful means of conveyance, and have equal rights upon the public roads with horses and carriages, their use should be accompanied with that degree of prudence in management, and consideration for the rights of other, which is consistent with their safety. If, as the jury found by their verdict, appellant knew, or could have known by the exercise of ordinary care, that the machine in his possession and under his control had so far excited appellee's horse as to render him dangerous and unmanageable, it was

his duty to have stopped his automobile, and taken such other steps for appellee's safety as ordinary prudence might suggest." This paragraph of the opinion is approvingly quoted in Christy v. Elliott, 216 Ill. l. c. 46. If the chauffeur driving defendant's automobile knew or could have known, by the exercise of ordinary care, that the buggy was headed toward him and the collision would take place unless the automobile was either stopped or turned to the opposite side of the road, it was his duty to have stopped the machine or turned to the right of the center of the road to avoid the collision. [Indiana Springs Co. v. Brown, 74 N. E. (Ind.), 615; Busher v. New York Transportation Co., 106 App. Div. 493.]

At section 12, Vol. 1 (5 Ed.), Shearman and Redfield on Negligence, it is said: "In determining what is the duty, the failure in which constitutes negligence, regard is to be had to the growth of science, and the improvement in the arts, which take place from generation to generation; and many acts or omissions are now evidence of gross carelessness, which a few years ago would not have been culpable at all, as many acts are now consistent with great care and skill, which in a few years will be considered the height of imprudence." The automobile is a modern invention, propelled by steam, electricity or gasoline, and attains a very high rate of speed. It is of great weight, made very strong and in a collision with an ordinary vehicle is capable of smashing it without serious damage to the machine itself, and while it has equal rights on the road with the ordinary vehicle, it is a sort of menace to the traveling public and, on account of the danger to others incident to its operation upon public highways, the chauffeur in charge is bound to exercise care commensurate with the risk of injury to other vehicles and pedestrians on the road; and this risk of injury, it seems to us, is as great if not greater than is the risk of injury to vehicles and pedestrians traveling on and across streets upon which street cars are operated

by electric power, and we can see no reason why the chauffeur in charge of an automobile, traveling on a public highway in a populous city should not be held to the same degree of care in respect to pedestrians and other vehicles upon the street as is a motorman in charge of a street car running on a public street; if so, then it was the duty of defendant's chauffeur to keep a vigilant watch ahead for vehicles and pedestrians and on the first appearance of danger to take proper steps to avert it. [Rapp v. Transit Co., 190 Mo. 1. c. 161, 88 S. W. 865, and cases cited; Sluder v. Transit Co., 189 Mo. 1. c. 136, 88 S. W. 648; Riska v. Railroad, 189 Mo. 169, 75 S. W. 445; Sepetowski v. Transit Co., 102 Mo. App. 1. c. 119, 76 S. W. 693.] According to Kelly's evidence, the chauffeur did not do this, and for this neglect plaintiff was entitled to have the case submitted to the jury.

It is further contended that plaintiff should have been nonsuited, for the reason the evidence conclusively shows her deceased husband was guilty of negligence that directly contributed to his injury. A bottle about one-third full of whiskey was found in the bed of the buggy after the accident. Several witnesses testified to the smell of liquor on the breath of both McFern and Keely immediately after the accident. John Edward Case, a witness for defendant, testified he was walking on Forest Park roadway near where the accident occurred, saw the automobile and the buggy, and that "The horse was going as fast as he could and seemed a spirited animal, and the men — two of them in the buggy, were urging the horse to go still faster. The men acted as if they were drunk; they talked like it and seemed to sit unsteady. I felt that something was sure to happen as the men in the buggy were not able to control or direct the horse. I saw an automobile approaching from the north with two lights burning, and saw the automobile turn a little to the east when I heard a crash and

saw that the buggy had run into the automobile. I came forward and helped to remove the two men, who were found lying on the roadway, on the adjoining grass. They both smelt of liquor on their breaths very strong, and were in a stupor. The horse had torn loose from the buggy and disappeared. The buggy was damaged considerably. We found in the body of the buggy a flask of whiskey about one-third full."

Kelly said in his evidence, that McFern pulled the horse to the left in front of the automobile. Defendant offered city ordinance No. 19991, making fast driving, etc., a misdemeanor. Defendant's evidence tends to show that Horner, the chauffeur, is an experienced and an unusually careful chauffeur. Kelly testified that he and McFern had been out driving the greater part of the afternoon; that McFern had drank no whiskey at all and had only taken a small beer and a glass of wine; that neither he nor McFern were in the least intoxicated, and the horse was a very gentle animal, a family horse. The physician who attended the injured men at the hospital, testified that neither of them showed any indication of intoxication and there was no smell of liquor about them when brought to the hospital. The buggy came from a livery stable, and Kelly testified he knew nothing about the bottle of whiskey said to have been found in the bed of the buggy, and if one was there neither he nor McFern placed it there. The evidence is conflicting in respect to a violation of the city ordinance against fast driving. The evidence of both parties shows that the horse was pulled to the west, and the machine to the east, and the horse escaped injury, and the physical facts show this to be true, hence Kelly's statement, that McFern "threw" the horse to the left, in front of the machine, should be interpreted in the light of this other evidence and when so interpreted it shows that Kelly was mistaken; that instead of the horse being pulled to the left in front of the machine, he was pulled

to the left in order to escape contact with the machine, and did escape; that if he had been pulled in the opposite direction he would have been struck by the machine as it was turned toward the east. But even if McFern did pull the horse in the wrong direction, if, as Kelly's evidence tends to show, the automobile was only fifty or sixty feet away and coming directly toward the buggy; at a speed of twenty or twenty-five miles an hour, in such circumstances, negligenec could not be imputed to McFern, as a matter of law. He was confronted with a sudden danger and his failure, if he did fail, to exercise what might seem to others the best judgment, was not necessarily negligence. [Sweeney v. Railway, 150 Mo. l. c. 399.] We do not think the evidence as a whole, as a matter of law, convicts McFern of contributory negligence. This question, in our judgment, was a proper one to submit to the jury for its determination.

2. Michael Mullen, a witness for defendant, testified plaintiff's intestate was engaged in the undertaking business at the time he was killed. When asked by defendant's counsel what other business, if any, he conducted in connection with his undertaking business, the witness answered: "Well, he told me that he—" (interrupting). Plaintiff's counsel objected on the ground that what McFern told the witness was not competent and the objection was sustained, to which ruling defendant saved an exception. Defendant insists that as plaintiff's right of action is a transmitted one [Strode v. Transit Co., 95 S. W. l. c. 853] the witness should have been permitted to answer the question. What the answer of the witness would have been is not stated in the bill of exceptions nor is it indicated by the question itself. Conceding then, for the sake of the argument, the court erred in not letting the witness answer the question in full, there is nothing before us from which we may determine whether or not the defendant was in the least

prejudiced by the ruling of the court, and the exception in these circumstances will not avail defendant. [McCormick v. City of St. Louis, 166 Mo. 1. c. 339, 65 S. W. 1038; Summers v. Ins. Co., 90 Mo. App. 691.]

3. The following proceedings took place at the trial:

"This case was called at time set for trial, to-wit, at 10:00 a. m., Monday, October 9, 1905, and Joseph A. Wright., Esq., representing plaintiff, and Frederick A. Wind, Esq., representing defendant, announced ready for trial. This cause was then continued from day to day, on account of another case, Official Guide Co. v. Barnes, remaining over from week previous unfinished.

"And this cause being called for trial 2:35 p. m. on Wednesday, October 11th, eighteen jurors were called to the box and sworn on their *voir dire*.

"Mr. Wright: 'Gentlemen, this is an action for the death of Alfred McFern, brought by his widow —— McFern. McFern died from injuries which he sustained in a collision between an automobile and buggy on the 11th of November, 1904, at or near the intersection of Forest Park boulevard with the driveway of Forest Park, immediately west of Kingshighway in this city. At that time that automobile was being operated by the defendant, F. D. Gardner, Mr. Wind—Frederick A. Wind, is attorney for the defendant.'

"Juryman No. 1, answering the questions, name, residence, business, insurance company employing, address, and at the question, 'Are you acquainted with Mr. Gardner?'—

"Mr. Wind (here first appearing at the trial): 'I am engaged in a trial in No. 6.'

"The Court: 'You told me you would be engaged in a room not No. 6. Your client can get another lawyer if you cannot come; we will proceed with the trial.'

"Mr. Wind: 'I thought on account of the Hains-

worth v. Rutledge case on trial in this division not being concluded at 2 o'clock I went into this trial in No. 6. Then we were ready to proceed at 2 o'clock.'

"The Court: 'Proceed with the examination of the jurors.'

"To which action and ruling of the court defendant by his counsel then and there duly excepted.

"Examination of jurors here continued until that of No. 3 was completed, when Mr. Gardner arose: .

"Mr. Gardner (the defendant) : 'I am embarrassed, my attorney is engaged in another court room.'

"The Court: 'You can get some other attorney. I am very sorry. Mr. Wind has been here with reference to carrying on this case from day to day. The court has wanted to suit him; he has stated twice he would be here, went into the trial of one case, disposed of that case, went over and got into the trial of another case, a second case. The court has to continue this case or go ahead and try it.' (To Mr. Wright) 'Proceed with your examination.'

"To which action and ruling of the court defendant then and there duly excepted.

"At the conclusion of the examination of the fourth juror, the deputy sheriff from court room No. 6 presented a memorandum to the court from Judge Douglas of Division No. 6, stating that Mr. Wind was engaged in the trial of a case in that division.

"The Court: 'Present my compliments to Judge Douglas and tell him this case in this room is specially set, has been at bar since Monday, and that Mr. Wind has on three separate occasions stated himself he would be here, specifically stated he would come in and try this case at the conclusion of a case he had in another division than Judge Douglas' division, and under the circumstances, with the number of parties connected with the trial of the case, I do not feel that I can post-

pone the trial of this case.'

"To which action and ruling of the court defendant then and there duly excepted.

"Examination of the jury is here continued by plaintiff's counsel until No. 18 is completed.

"Mr. Wind: (Having been absent from the court room until the examination of the twelfth juror was finished by plaintiff's counsel) 'I do not know how much of a statement Mr. Wright has made,' etc., and the trial proceeded."

It is contended that defendant was prejudiced by this proceeding. It does not appear that an opportunity was refused Mr. Wind, defendant's counsel, to examine the twelve jurors who had been passed by plaintiff's counsel, on their *voir dire,* when Mr. Wind first appeared at the trial, and we cannot infer that defendant was denied his right to properly examine all the jurors as to their competency, qualifications, etc. It is argued the court accused Mr. Wind of bad faith in the presence of the jury, and of having made misstatements to the court in regard to his readiness to go to trial. There is nothing in what the court said warranting this criticism. Mr. Wind had gone into the trial of the case in Judge Douglas' division in anticipation that the case then on trial in Judge Taylor's division (where this case was tried) would consume more time than it did, and on account of this mistake found himself not ready to proceed with the trial in Judge Taylor's division. Judge Taylor called attention to these facts, not to the jury, but to the parties and counsel in the suit and refused to postpone the trial until Mr. Wind could finish his case in Judge Douglas' division. We do not see how the jury could have been biased or prejudiced against Mr. Wind as a lawyer from what was said by the court. They might have inferred that Mr. Wind was indiscreet in taking up the case in Judge Douglas' division in the cir-

cumstances, but there is nothing in the whole matter to justify the inference that Mr. Wind had acted in bad faith or that the court accused him of having acted in bad faith or of having made any misstatements.

Discovering no reversible error in the record, the judgment is affirmed. All concur.