FRANK J. REYNOLDS, RESPONDENT, v. GRAIN BELT MILLS CO., APPELLANT.—78 S. W. (2d) 124.

No. 17526.

Kansas City Court of Appeals. December 3, 1934.

*Stringfellow & Garvey* for respondent.

*Brown, Douglas & Brown* for appellant.

TRIMBLE, J.—This is an appeal by defendant from a judgment finally rendered in plaintiff's favor for $7470.64, in a suit wherein plaintiff sued for damages sustained by reason of being struck by defendant's automobile on the streets of St. Joseph, Missouri.

The second amended petition, on which the case was tried, alleged that on August 23, 1928, about 3:35 P. M., while plaintiff, in the exercise of due care, was crossing Illinois Avenue from south to north at a point just east of Lake Avenue and about the center of Illinois Avenue he was struck by defendant's automobile proceeding west on said Illinois Avenue, and was thereby seriously and permanently injured.

That the point where he was crossing "is a point where for a long time prior to said date a large number of pedestrians had been accustomed to cross said street at all times of the day and especially between the hours of three and four o'clock in the afternoon" and the defendant knew or should have known this; that defendant carelessly and in violation of the statute, operated its motor vehicle as it approached the point where plaintiff was crossing, at a high, dangerous and unlawful rate of speed under the circumstances (it being a point where many pedestrians were in the habit of crossing), without keeping a "vigilant watch" and without giving a "warning" and without keeping the said motor vehicle under such control that it could be stopped or a collision with pedestrians who might be crossing the street could be avoided; and carelessly failed to stop or turn to one side in time to avoid running against plaintiff, but carelessly ran said motor vehicle into and upon plaintiff as aforesaid.

· The said second amended petition also alleged that, at the time, plaintiff was in the employ of the St. Joseph Gas Company; that

said company and its insurer have refused to bring the suit which is here instituted by plaintiff, and have relinquished and duly assigned and transferred to plaintiff all claims, rights and causes of action arising under the Workmen's Compensation Law of Missouri, which his employer, the St. Joseph Gas Company, has or might have against defendant on account of damages sustained by plaintiff as a result of said accident and injuries, and plaintiff is the owner of all such rights, claims or causes of action, and is entitled to sue therefor;

That when struck by said motor vehicle, he received "severe bruises about the head, face and body; a concussion of the brain; severe injury to the muscles, bones, tendons, nerves, and tissues of the left arm; and a severe nervous shock; and that said injuries are permanent;" that he was confined to the hospital "for a number of weeks," has been required to expend and incur obligations for large sums of money for hospital care, nursing and medicines, medical and surgical attention; has been wholly incapacitated from doing any work from the date of the accident to the date of filing the petition (December 21, 1928) and will be so incapacitated for a long time to come; and that he has been damaged in the sum of $15,000. Wherefore, judgment is prayed for that sum.

Defendant's answer to said petition admitted its corporate nature, and that an automobile owned and operated by it collided with plaintiff on or about the date alleged, but denied every other allegation.

The answer then alleged that plaintiff was "guilty of negligence in stepping from behind a standing street car immediately in front of or against the automobile without first having looked to ascertain whether the automobile or any other conveyance was approaching" and that such negligence contributed to cause the injuries complained of.

Thereafter on June 13, 1931, defendant filed a motion asking that the plaintiff's employer, the St. Joseph Gas Company, and its insurer, the Employer's Liability Assurance Corporation, Ltd., of London, England, be joined as parties plaintiff, alleging that the latter, at the time he claims he was injured, was an employee of said Gas Company, and it was operating under said Workmen's Compensation Act with the Assurance Company as its Insurer; and that defendant has reason to believe, and does believe, that plaintiff was paid compensation by defendant or its insurer to the amount approximately of $3000; that plaintiff has alleged in his petition that all causes of action "arising out of or under the Workmen's Compensation Law of Missouri, or otherwise which the said St. Joseph Gas Company had or might have against the defendant on account of damages sustained by plaintiff as the result of said accident and injuries" have been assigned to him and that he is the owner thereof; but that the defendant, sic, (plaintiff) has not filed with or made

a part of his petition a copy of any such assignment; that it (defendant) has reason to believe that the said Gas Company or its insurer, "is to be reimbursed the full amount of its expenditures on plaintiff's behalf, by the plaintiff, should he recover a judgment against this defendant, and that should any such judgment be obtained by plaintiff he will have no interest therein except to the extent of any amount which might be recovered over and above the sum of Three Thousand Dollars ($3000);" said motion further set up that said Employer and said Insurer are necessary and proper parties to this action, in order that their interests may be determined.

The record merely shows that the above motion was overruled.

At the October Term, 1931, a trial commencing on October 26, 1931, was had, and the jury returned a verdict in favor of plaintiff for $8000 which, by plaintiff's voluntary *remittitur*, was reduced to $7470.64 and on this, judgment was finally rendered from which defendant took an appeal which, after many vicissitudes not necessary to reveal here, finally landed in this court.

The evidence as to the collision or accident and the resulting injuries, is, in substance, as follows:

Plaintiff testified he was twenty-eight years old and working for the St. Joseph Gas Company at the time of the accident on August 23, 1928; he was a gas fitter or pipeman, who has to be as strong in the left as in the right hand as he often has to handle two wrenches at the same time, and that on the day of, and prior to, the accident, his left arm was normal, he having had no trouble with it since he went to work as a plumber in 1918 or 1919.

On the day of the accident or injury, he was required by his employer's work to go to 320 Illinois Avenue which was close to, or in the vicinity of, the place of the accident. After he and a fellow employee had finished the work, they started across Illinois Avenue at the place where the collision occurred his associate shortly, perhaps a minute, preceding him. When plaintiff started to cross Illinois Avenue, he glanced up and down the street before he started across but saw no automobile coming from the east or west. He went as far as to the rear of a street car standing in the street, with the intention of passing behind or west of it about three or four feet; as he was in the act of making a step past it, the automobile of defendant, coming from the east on that (the north) side of the street car, "hit me in the leg." He threw up his arms to protect his face and his left arm was caught between the handles of the two doors defendant's automobile and plaintiff was jerked ten or fifteen feet down the street, in the direction defendant's automobile was going, and landed on his head. By the time he could raise his head defendant's automobile was in the middle of the intersection of Lake Street and Illinois Avenue and still going. Plaintiff never did see

the automobile stop. He did not at that time care whether the automobile stopped or not, as the pain he was suffering was so great that he was glad the hospital attendants put him to sleep.

He further testified that when he walked to the center of the street and was in the rear of the standing street car, and about three or four feet to the rear of it, he "started to make the step so you could see, and was in the act of making the step." He was at this time at the rear of the street car. "Q. Had you stepped one step and put your foot on the ground?" And his reply was, "A. I was making the step and the fender hit me in the leg and I throwed up my arm to protect my face." When asked what he was doing at the time, he said: "A. As I was taking the step I was looking to see if there was any automobile coming which would run into me. And just as I started to make the step, is when I got hit." He testified it was "approximately around" twenty feet from the north rail of the street car track to the north curb on Illinois Avenue, and the body of the street car projected north over the rail "about a foot," and an automobile parked on the north curb would occupy "somewhere about six feet—between five and six feet." (The reason for, or relevancy of, this will perhaps appear later.)

He further testified he was in the hospital six weeks, the first time for two weeks and then out for four weeks and then was sent back "for skin grafts" and was in for two weeks more, and then got out again and while walking down the street he sneezed "and the artery busted in the arm and I was taken back to the hospital again" and he was in for two weeks more. At the end of five months he was finally free from the hospital, and along in January he went back to work, but on account of the condition he was in as a result of his injuries, the work given him was "very light," inspecting, "just walked around and looked at work that was done to see if it was right." At the time of the trial he had not been able to do manual labor of any kind whatever, since he cannot hold a wrench in the left hand and pull against it with the other. (Witness here displayed his arm to the jury), and he then testified that the accident "tore all the muscles out of it and left it awful weak." In order to have the skin grow on the arm where it was torn off, the surgeon took skin from off his leg and grafted it onto his arm. When the artery in his arm burst from sneezing while walking to get some exercise, as directed by the physicians, the surgeons at the hospital had to put him under a general anaesthetic and tie the artery up.

On cross-examination, he testified he was earning from $35 to $40 per week. The safety stop where the street car usually stopped, and on this occasion was stopped, was close to the middle of the block, and his truck was parked directly across north from where the standing street car was, and plaintiff was a little south of, and a little bit more than a foot or two west of, the street car. Before plaintiff

stepped off the curb into the street to cross, he looked east and west and no cars were in sight. The standing street car was one of the large and long cars. After one gets behind the street car as one is going north across the street the view east up the street is obstructed more the nearer one comes to the car, and when one is behind it, he can't see east at all.

Plaintiff further testified, on cross-examination, that as he was crossing the street to a point three or four feet behind the rear, or west end of, the car, he was looking up and down the street and was looking east as he started around the car. While he says he was about three or four feet from the rear end of the car as he was crossing, he was not as near to the car as the automobile was which struck him. The standing street car projected beyond the rail about a foot. There was something like eleven and one-half feet left for the automobile to pass between the street car and his truck which he and his companion worker, White, had left parked on the north side of Illinois Avenue when they went to the place where they did some work and to which truck plaintiff was returning when struck. It was parked "right against the north curb."

Plaintiff further said, on cross-examination, that he was about six inches, he didn't know exactly, north of the street car "getting ready to look around the corner of the street car, and just as I stepped out to get a look when I didn't see any car (automobile)," and just as he started to step, or was "just in the act of stepping," the automobile came swiftly by, and its fender hit him on the leg; he threw up his hand and he was thrown fifteen feet down the street on his head. He said he was trying to get far enough so he could see and was in the act of stepping—defendant's automobile might have been a foot north of the street car. Plaintiff said, "I don't just exactly know how close it was but I know it was close enough to hit me when I looked around. I was in the act of making the step." "When I started to make the step to look I got hit." "When I started to make the step so I could see was when I got hit." He further said that, at the rate of speed the automobile was coming, one could not, at the short distance he was behind the street car, see the automobile until he started to make the step, and when he started the automobile "would have been right there." He further said that if he had come up to the edge of the street car and peeked around it the automobile would not then have been in sight but when he started to make the step so he could see, the automobile struck him.

Plaintiff's companion workman (who had preceded plaintiff across the street and who was sitting in the car, in which they had come to, and were expecting to return from, their work, waiting for plaintiff to come across the street), testified he was looking south, and saw plaintiff coming, "and he got in behind the street car and he was just right at the edge of the street car in the act of taking a

step to look around the street car to see if anything was coming from the east and just—it hit him just as he looked around the corner. The car (automobile) was coming kind of headed a little bit west and south coming from behind the truck.'' Witness says he saw the automobile just as it hit plaintiff. He did not see it before that. The automobile knocked plaintiff down ''and took him about fifteen feet down the street'' and then went on down to the next intersection. It was defendant's car.

Witness testified, on cross-examination, that the car they had parked on the north side of the street and in which witness was sitting was somewhat north of the standing street car. Plaintiff was struck by defendant's automobile as plaintiff was taking a step, possibly it may have been a foot from and north of the car. He saw the automobile just as plaintiff was struck, and judged it was going thirty-five to forty miles per hour, though he had no way of telling the exact speed. Plaintiff did not walk into the side of the car. He stopped in the act of making a step to see if any car was coming from the east. He (witness) could see plaintiff until the car hit him. It would not have been possible for him to have stopped right in back of the street car and looked around it and avoided being struck. ''Oh, he might have got up close to the (street) car and peeped around the corner'' without being struck. ''He could have done that'' . . . but ''I don't see how'' he could have avoided being struck. The place where the street car was standing was the ordinary and regular stopping place for the cars on that street.

Archie Ide, witness for plaintiff, testified he was on the north side of Illinois Avenue and saw plaintiff as he started across the street. He left witness and went across going directly toward his truck. As he went behind the street car he was ''Oh, about four or five feet from the rear of the street car.'' . . . It (the automobile), came about a foot close to the street car, going about thirty to thirty-five miles an hour. Plaintiff went in an ordinary walk. Plaintiff went about four feet from the rear end of the street car and he was struck about a foot, or maybe a foot and a half, something like that, north of the street car. He was looking east as he went around the corner of the street car. ''He stepped out behind the street car'' and the automobile struck his arm with the handles and threw him to the pavement. He stepped out there and the car hit him. Witness was on the south side of the street were he was looking north and could see and did see it all.

Defendant, after offering a demurrer to the evidence (which was overruled), introduced the evidence of certain witnesses, among whom was Morrison, the driver of defendant's car that struck and injured plaintiff.

He testified that the ''safety stop'' where the street car was standing, was, he could not say precisely, in the neighborhood of twenty-

five or fifty feet from the intersection of Illinois Avenue with Lake Avenue. "It might have been further than that;" the rear end of the standing street car was about that far from the intersection. There was one or more cars parked along the north curb where plaintiff's car was. He could not say how many cars were there. "I know there was one and possibly more." He testified he was driving "approximately in the middle of the space between the parked cars and the street car." He was "approximately three feet *more or less*" (emphasis mine) from the street car, driving "in the neighborhood of fifteen or twenty miles an hour." He did not "personally" see plaintiff before the collision occurred. He said, "The front end of my car had about gone past the rear end of the street car and the first time I saw Mr. Reynolds was just had a glance after he ran into the side of the middle of my car and that is the first thing I know of the accident, before I was past the rear end of the street car and he was just about even with my face, about even with the back of the driver's seat." He (plaintiff) ran into the side of the driver's car. It appeared that plaintiff's arm was caught between the handles of the doors, that of the front door and the one in the front of the rear door. "He appeared to be very near to the rear of the street car." . . . "He was right up against the side of the street car as nearly as I could say." Witness testified he was watching where he was driving as he came down there, but it was impossible to see plaintiff before the accident happened, "he was really too close to the street car to see him." Witness "really could not say" whether he blew his horn or not. He did not remember about that one way or another. He didn't think there were any cars ahead of him and "didn't know that there were any behind me either."

On cross-examination defendant's witness Morrison testified he was seventeen years of age at the time of the accident. Witness said he would not make any definite statement about how far the rear of the standing street car was east of Lake Avenue. He imagined it stopped at the usual stopping place. Sometimes he was along there every day, sometimes he was not. "It (the street car) was in the vicinity of where it usually stopped, I imagine." The street along there was "a fairly busy street, yes, sir."

Mrs. Mary Karohl, a witness for defendant, testified that at the time of the accident she was standing on the south side of the street west of the rear end of the street car. She saw plaintiff as he started across the street. He passed within a foot of the rear of the street car. He did not get to the other side of the street car. He walked around the rear end of the street car. An automobile going west on the other or north side of the street car (which witness did not then see, on account of the street car), and traveling "within two or three feet" north of the street car and the same distance from

the parked cars at the north curb of Illinois Avenue, was going about fifteen or twenty miles an hour, and "apparently he (plaintiff) ran into the car." Witness said she was in a position where she could see. She was looking "just casually" at the time the accident occurred. His body struck the car "about the middle— the front part of the car had come past the street car before the man struck it." He was walking "at a moderate rate of speed straight across the street." "Q. Did he ever look to the east after he passed the street car? A. Not that I ever saw."

The foregoing, in substance, is the testimony as to how the accident happened. At the close of all the evidence, the defendant asked instructions lettered A-2 to G, the first of which sought to tell the jury that there was no evidence to show that the cause of action sued on by plaintiff was ever assigned or transferred to him, and under the pleadings and evidence the jury should find a verdict in defendant's favor; B. That plaintiff has failed to make out a cause of action, and verdict must be for defendant; C. That plaintiff was guilty of contributory negligence "in stepping from behind the street car in front of or against defendant's automobile" and verdict must be for defendant; D. That there was no evidence from which the jury could find that the rate of speed at which defendant's automobile was being driven directly contributed in any way to cause plaintiff's injuries; E. was to the same effect. Instruction F. was to the effect that "the plaintiff had no right to assume that defendant would operate its automobile in a careful and prudent manner, and to rely solely on that assumption, nor had plaintiff any right to rely solely on any obligation that may have rested upon the defendant with respect to the operation of its automobile, and that it was plaintiff's duty at all times to exercise ordinary care to look out for his own safety and to prevent being struck by defendant's automobile;" and G. That there was no evidence from which the jury could find that the driver of defendant's automobile was guilty of negligence in failing to keep a vigilant watch for pedestrians at the time and place when and where plaintiff was injured. These instructions were all refused.

Appellant raises the point that as plaintiff was, at the time of his injury, in the employ of the St. Joseph Gas Company and in the course of such employment when he was hurt, and sought and obtained compensation from the Missouri Workmen's Compensation Commission, therefore his employer and its insurer should have been made parties to the suit, as appellant's motion asked, and hence it was error to overrule that motion.

The theory of this contention is that Section 3309, Revised Statutes of Missouri, 1929 (12 Mo. St. Ann., p. 8244), of the Workmen's Compensation Act "subrogates the employer to the rights of the employee where the employee has been paid compensation   .   .   .

and the remedy provided by that section . . . is an exclusive one.''

We have examined the Nebraska cases cited, from which state our Workmen's Compensation Act is said to have been taken (particularly Section 3309 above mentioned), and without passing on the question whether we are *compelled* to adopt the construction placed on said Section by the Nebraska courts, we think that by the *later* decision of the Nebraska Supreme Court in the case of O'Donnell v. Baker Ice Machine Co., 205 N. W. 561, under the circumstances in the case at bar, plaintiff is entitled to sue as he has done herein, even if it should be held that we are bound by Nebraska law; and therefore the case herein should not be reversed on the point raised. The record in the case at bar discloses that the employer, before suit was brought, declined to sue and later made a contract with the plaintiff by which the employee's rights were assigned to plaintiff and plaintiff agreed to pay to the employer, out of any recovery he should obtain, whatever sums the employer had been required to pay to or for plaintiff either as compensation, or as medical or hospital services. We fail to see how defendant (appellant herein) can claim to be harmed by the failure to join the employer or its insurer in this suit. Where the employee is injured through the alleged negligence of a third person or entity, the party suing, whether employer or injured employee, is a trustee for the other beneficially interested to the extent of his, its or their interest. The section 3309 does not, in itself, *create* the cause of action sought to be enforced by plaintiff. The section is for the protection and benefit of the employer. The Compensation Act does not take away the employee's common-law right against an offending third person. [Sylcox v. National Lead Company, 38 S. W. (2d) 497. See also Langston v. Seldon Brick Construction Co., 37 S. W. (2d) 474.] As the employer's rights are taken care of by what plaintiff has agreed to do, the defendant herein has no ground of complaint.

This, we think, disposes also of the point that there was no evidence that the cause of action was ever assigned to the plaintiff by the St. Joseph Gas Company, his employer.

It is insisted that the demurrer to plaintiff's case offered at the close of the entire evidence should have been sustained for three reasons: (1) failure to prove any causal connection between plaintiff's injury and the operation of defendant's automobile; (2) plaintiff showed he was guilty of contributory negligence as a matter of law; and (3) because no assignment of the cause of action was made to him by his employer, the St. Joseph Gas Company. This third point has been heretofore ruled on and held to be unavailing.

With reference to the point that there was no causal connection between the speed of the automobile and plaintiff's injury, it may be said that the charge in the petition is not that the speed was in

violation of an ordinance, and hence cases of this character are not in point. It is true, there must be such a showing as that the jury could reasonably find a causal connection between excessive speed and the injury. This unquestionably cannot be controverted. But in the case at bar, the charge of negligence is that defendant, at a point where for a long time prior to the injury large numbers of pedestrians had been accustomed to cross the street at all times of day and especially about the hour of the occurrence; that this was known, or by ordinary care could have been known; that defendant's automobile was operated in approaching the point in question "at a high, dangerous and unlawful speed under the circumstances then and there existing" without keeping a "vigilant watch" or giving a "warning sign" and without keeping the automobile under such control that it could be stopped or swerved to one side, and the collision avoided. Now, it is elementary that in determining the sufficiency of the evidence to support a verdict for plaintiff after a demurrer has been overruled, only evidence in plaintiff's favor, with all reasonable inferences therefrom, must be considered and taken as true. If plaintiff's verdict is supported by substantial evidence, even though meagre and contradicted by defendant's evidence, it will not be disturbed on appeal. [Robison v. Chicago, Great Western R. Co., 66 S. W. (2d) 189.] Defendant claims plaintiff walked into the side of defendant's car, but the evidence in plaintiff's favor and behalf is that the automobile's fender struck him on the leg and he involuntarily threw up his left arm and his hand was caught between the handles and he was jerked violently down the street on his head, and very grievously injured. We cannot say the speed of the automobile (shown, by the evidence in plaintiff's behalf, to be thirty-five to forty miles per hour), while passing this standing street car where many were accustomed to cross the street, and where, for aught that the driver of the automobile knew, a passenger might at any moment step from the car and attempt to cross therefrom to the north side of the street. Again, defendant claims that there were other motor vehicles than plaintiff's truck, parked along the north curb, affording a very narrow space for defendant's motor vehicle to go through, and this, with the other attendant circumstances detailed, might well lead the jury to find that the degree of care required by law of the driver of the automobile, in passing such a point, was not observed.

It is claimed that the striking of plaintiff was caused by plaintiff's contributory negligence, but there was evidence from which the jury could find that he was not negligent. There was evidence to show that, as he started across the street from the south curb to the standing car, he was looking up and down the street looking for passing automobiles and was looking east as he started around the street car. He looked around the corner of the street car, but could

see no automobile and as he was in the act of stepping to where he could see a motor car, it was "right there" and struck him on the leg; and his arm, being thrown out, was caught and he was jerked violently down the street. The reason no car was seen when he looked the first time, around the corner of the street car, was because no automobile was then in the territory within observation, but, owing to its speed, it was there when he was in the "act of making the step" and "the fender hit me in the leg." He testified that when his arm went between the two handles of the doors "there was a 'blare' is all I got from the automobile. If he had driven slow, the chances are I could have seen it but just a big 'blare' is all I got and I lit ten or fifteen feet down the street on my head." From this the jury could well find that, if the automobile had not been driven so rapidly, plaintiff could have seen it sooner and would have had time to have avoided it; and the driver could also have had an opportunity to avoid the injury. Defendant was the one operating a dangerous instrumentality and was required by the law to exercise "the highest degree of car." As said in Bongner v. Zeigenhein, 165 Mo. App. 328, 1. c. 340, 341:

"Automobiles are ponderous and dangerous machines, possessing great power and speed and, therefore, threaten imminent hurt in a highway, if not properly controlled and conducted. While they enjoy the same right to the highway as that possessed by the pedestrian, no one can doubt that the measure of duty imposed by the law upon one operating an automobile is to be viewed and determined as commensurate with the risk entailed through the probable dangers attenting the particular situation. [McFern v. Gardner, 121 Mo. App. 1, 97 S. W. 972; Hall v. Compton, 130 Mo. App. 675, 108 S. W. 1122.] Where the duty enjoined is an extraordinary one—as that pertaining to the operation of automobiles—and the situation approached highly suggestive of hurt to others, we believe slight evidence may be sufficient to suggest a breach."

And with reference to the charge of plaintiff's contributory negligence, the court further say:

"As to collisions in the highway, where both parties have a right to be, there is generally a fair question for the jury both on the matter of defendant's negligence and that of the contributory negligence of the plaintiff. [See Wyler v. Ratican, 150 Mo. App. 474, 131 S. W. 155.] From a further consideration of the authorities, we are persuaded that the cause is, indeed, an exceptional one where plaintiff's right of recovery should be denied as a matter of law for his contributory negligence, when it appears he was run upon and injured in the highway by a conveyance which is not required to travel in a particular place, as street cars on the tracks, which, of course, of themselves suggest danger as always present. In other words, in those cases where injury is inflicted by a conveyance which

may occupy one portion of the street at one time and some other portion at another time and the injured person is not forewarned as by the danger incident to car tracks, the matter of plaintiff's contributory negligence is usually for the jury." [See also Ginter v. O'Donoghue, 179 S. W. 732, 733.]

Plaintiff had a right to be where he was. [Michelson v. Davis, 227 S. W. 641; Moffatt v. Link, 229 S. W. 836; Meenach v. Crawford, 187 S. W. 879.] We are not unmindful of the rule that a person, crossing a street as plaintiff was, is required to exercise somewhat more care than at a regular crossing, but the evidence is such that a jury could find that he was doing this, and consequently we cannot hold that he was contributorily negligent, as a matter of law.

The appearance of plaintiff from behind the street car was, at the place and under the attendant circumstances, such a thing as the driver of the automobile was required to anticipate; and hence, in the exercise of the care the law demands of him, he should have signalled his approach, and regulated his speed so that the automobile would be under control. [Johnson v. Johnson, 163 S. W. 160; Sternfield v. Willison, 161 N. Y. Supp. 472; Frary v. Taxicab Co., 198 N. W. 897.] It is true plaintiff's charge of negligence rests solely on negligent speed, but the failure to give a warning may be considered on the question of whether plaintiff was guilty of contributory negligence as a matter of law.

The above and foregoing disposes of all points in the case (though expressed in different form) except the one that the verdict is excessive. The description heretofore given of the pain and suffering, the times he was in the hospital, the extent of his injury and its permanent result, does not reveal a case of an excessive verdict. In Vaughn v. St. Louis Merchant, etc., Terminal Ry. Co., 18 S. W. (2d) 62, a verdict of $50,000 for loss of an arm, and other injuries, not permanent however, was reduced to, and allowed to stand at, $25,000. [See also the cases of Berry v. Baltimore & Ohio R. Co., 43 S. W. (2d) 782; Miller v. Collins, 40 S. W. (2d) 1062; Zumwalt v. Chicago & Alton R. Co., 266 S. W. 717; Rockstein v. Rogers, 34 S. W. (2d) 792; Hughes v. Schmidt, 30 S. W. (2d) 468; Becker v. Koester, 295 S. W. 818, 820; Guidice v. Viviano, etc., Mfg. Co., 8 S. W. (2d) 964; Clayton v. Metal Crafts Corporation, 12 S. W. (2d) 938.]

The judgment is affirmed. All concur.